UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re:<br><br>Mary Stephanie Schwarz,<br><br>    Debtor.<br>_____<br><br>Thomas Klonecki,<br><br>    Plaintiff,<br><br>v.<br><br>Mary Stephanie Schwarz,<br><br>    Defendant.<br>_____ | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 24bk13074<br><br>Chapter 7<br><br><br><br>Adversary No. 24ap00405<br><br>Judge Timothy A. Barnes |

TIMOTHY A. BARNES, Judge.

MEMORANDUM DECISION[1]

    The matter before the court comes on for consideration on the Complaint Objecting to the Dischargeability of Debt [Adv. Dkt. No. 1] (the "Complaint"), filed by Thomas Klonecki (the "Plaintiff") in the above-captioned adversary case (the "Adversary").[2]  The Complaint seeks, pursuant to sections 523(a)(2) and (4) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), a determination of nondischargeability of debt allegedly owed to the Plaintiff by Mary Stephanie Schwarz (the "Debtor") arising out of payments made in connection with the short-term rental of property.

    For the reasons more fully set forth below, the court finds that the Plaintiff has established the nondischargeability of debt owed by the Debtor to the Plaintiff under Count III of the Complaint, which relies on section 523(a)(4) of the Bankruptcy Code.  The Plaintiff, however, has

_____

[1]    This Memorandum Decision constitutes the court's findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure (the "Civil Rules" and, as to each, "Civil Rule ___"), made applicable to these proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules" and, as to each, "Bankruptcy Rule ___").  A separate judgment will be entered pursuant to Bankruptcy Rule 9021 and in accordance with Civil Rule 58(a), made applicable to these proceedings by Bankruptcy Rule 7058.

[2]    References to docket entries in this Adversary will be noted as "Adv. Dkt. No. ___."  References to docket entries in the underlying bankruptcy case, *In re Mary Stephanie Schwarz,* Case No. 24bk13074 (Bankr. N.D. Ill. filed September 4, 2024) (Barnes, J.), will be noted as "Dkt. No. ___."

not established that the debt due to him is nondischargeable under Counts I and II of the Complaint, each of which rely on section 523(a)(2)(A) of the Bankruptcy Code.

JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under the Bankruptcy Code. 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code or arising in or related to cases under the Bankruptcy Code. 28 U.S.C. § 1334(b). District courts may refer these cases to the bankruptcy courts for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

A judge of the bankruptcy court to whom a case has been referred has statutory authority to enter final judgment on any proceeding arising under the Bankruptcy Code or arising in a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(1). Such judges must therefore determine, on motion or *sua sponte*, whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(3). As to the former, the judge may hear and determine such matters. 28 U.S.C. § 157(b)(1). As to the latter, the judge may hear the matters but may not decide them without the consent of the parties. 28 U.S.C. §§ 157(b)(1), (c). For matters only related to a bankruptcy case, absent consent, the judge must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

In addition to the foregoing considerations, a judge of the bankruptcy court must also have constitutional authority to hear and determine a matter. *Stern v. Marshall*, 564 U.S. 464 (2011). Constitutional authority exists when a matter originates under the Bankruptcy Code or, in noncore matters, where the matter is either one that falls within the public rights exception, *id.*, or where the parties have consented, either expressly or impliedly, to the bankruptcy judge hearing and determining the matter. *See, e.g.*, *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 669 (2015) (parties may consent to a bankruptcy court's jurisdiction); *Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015) (noting that "implied consent is good enough").

As a complaint opposing dischargeability of a debt arises only in relation to a bankruptcy case, this matter is expressly a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (I). In accordance with *Stern*, 564 U.S. at 499, a judge of the bankruptcy court has authority to decide matters of nondischargeability, as the dischargeability of a debt is necessarily a matter that would stem from the bankruptcy itself. *Parkway Bank & Tr. v. Casali (In re Casali)*, 526 B.R. 271, 274 (Bankr. N.D. Ill. 2015) (Schmetterer, J.) ("A bankruptcy judge has constitutional authority to enter final judgment as to dischargeability."); *see also Chop Foo, LLC v. Fara (In re Fara)*, 663 B.R. 696, 707 (Bankr. N.D. Ill. 2024) (Barnes, J.) (same). Further, each of the parties has either expressly or impliedly consented to the undersigned's exercise of authority over this matter.

As a result, there exists jurisdiction, statutory authority and constitutional authority to hear and enter final judgment on the Complaint.

2

BACKGROUND

This matter arises within the context of a landlord-tenant relationship between the Debtor and the Plaintiff that began when the Plaintiff needed a short-term property rental for his family. The real property that was the subject of the rental is located at 1115 Voltz Road, Northbrook, Illinois 60062 (the "Property"). There is a dispute as to the leasehold term between the parties that is exacerbated by the failure of the parties to memorialize their agreement in writing. While both parties appear to be sophisticated individuals, this unprofessional nature of the dealings between the parties created ambiguity leading to difficulties in the parties' understanding their respective rights.

The dispute has its inception in the summer of 2022, when the Plaintiff was looking for a short-term rental and contacted the Debtor to rent the Property. The Plaintiff's expressed need to rent the Property at this time was to bridge the gap between the sale of his previous home and the remodeling of his new home.

What followed was a back-and-forth discussion between the Plaintiff and the Debtor regarding the leasehold dates and other terms. The Plaintiff offered to pay a premium for an earlier move-in date but, because the Debtor already had tenants in the Property, she was unable to accommodate the extent of his request. Ultimately, it was determined that the Plaintiff and his family would move in on August 5, 2022. Unfortunately, while that date was clear, the end date of the rental was less clear.

What is clear is that the Plaintiff and the Debtor agreed to rent the Property for $8,500 per week with an additional $10,000 for the security deposit. In that regard, the Plaintiff paid the Debtor a total of $52,500, with half paid on July 11, 2022, and the second half paid on July 15, 2022.

Even though the Plaintiff sent the money, there is no evidence that he signed a lease, though draft versions were circulated between the parties. One such draft, circulated by the Debtor, provided that the rental term would commence on August 5, 2022, and would continue to and including September 19, 2022, for a total term of six weeks and three days. The Plaintiff's payments, however, are more in line with a term of five weeks plus the agreed upon deposit.

Some time after the Plaintiff took occupancy, discussion was had regarding when the Plaintiff would vacate the Property. The parties eventually settled on a termination date of September 13, 2022, and on that date the Plaintiff and his family vacated the Property.

After vacating the Property, the Plaintiff requested the return of the security deposit. The Debtor initially communicated that she would be returning the security desposit after accounting for any damages. The Plaintiff continued to inquire about the return of the security deposit from the end of September 2022 to November 2022. Yet, the Debtor never responded. The Debtor neither transferred money to the Plaintiff nor provided him with an itemization of damages to the Property in connection with the Plaintiff's rental of it.

Shortly thereafter, the Plaintiff filed a lawsuit against the Debtor in the Circuit Court of Cook County (the "Circuit Court") on December 27, 2022. Compl., at ¶ 21. While the Circuit Court entered a default judgment, that was later vacated and the case proceeded with discovery. *Id.* at ¶ 24.

3

The Circuit Court lawsuit proceeded until September 4, 2024, when the Debtor filed a chapter 11 bankruptcy petition.  Official Form 101, Voluntary Petition for Individuals Filing for Bankruptcy [Dkt. No. 1] (the "Petition").  Shortly thereafter the Debtor's case was converted to one under chapter 7 of the Bankruptcy Code on September 25, 2024.  Order Converting Chapter 11 Case to a Chapter 7 Case and Shortening Notice [Dkt. No. 19].

PROCEDURAL HISTORY

The Debtor's Petition included Official Form 104, which listed the Plaintiff as a creditor.  Petition, Official Form 104.  The result of the filing of the Petition would be that, absent an action such as the one at bar, any obligation she may have to the Plaintiff on the succeeding facts would be discharged.

On December 29, 2024, however, the Plaintiff filed the Complaint commencing this Adversary, seeking a determination of nondischargeability with respect to any personal liability the Debtor may have to the Plaintiff.  In the Complaint, the Plaintiff alleges that he is owed a debt arising from the failure and refusal of the Debtor to return the $10,000 security deposit in connection with the rental of the Property.  Compl., at ¶ 2.  The Plaintiff seeks a judgment far in excess of the mere return of the $10,000 deposit, instead seeking $90,000 and also seeks a determination that that entire amount is nondischargeable.  The Plaintiff seeks such relief on three Counts, as follows:

> Count I:  That the debt be found to be nondischargeable because it was obtained by the Debtor's false pretenses, false representation and actual fraud under section 523(a)(2);

> Count II:  That the debt be found to be nondischargeable on account of it being for larceny under section 523(a)(4); and

> Count III:  That the debt be found to be nondischargeable on account of it being a defalcation by a fiduciary under section 523(a)(4) and the applicable city ordinance, the Cook County Residential Tenant and Landlord Ordinance, Ord. No. 20-3562, §§ 42-101, *et seq.* (amended June 1, 2021) (the "CCRTLO").

The Debtor, after being granted an extension to answer or otherwise plead, timely answered the Complaint on February 18, 2025.  The Defendant's Answer to Complaint Objecting to the Dischargeability of Debt [Adv. Dkt. No. 12] (the "Answer").  Throughout the Answer, the Debtor denies that her conduct made any debt owed nondischargeable as to the Plaintiff.  Answer, at ¶¶ 42, 55, 70.  The Debtor admits that the Plaintiff made a payment of $52,500 to lease the Property but denies that this amount represents the full amount owed under the parties' transaction for the weekly payments and the security deposit.  *Id.* at ¶ 16.

THE TRIAL AND THE EVIDENTIARY AND TRIAL RULINGS

On March 25, 2025, the court entered a pretrial scheduling order.  Trial Scheduling Order [Adv. Dkt. No. 21] (the "Pretrial Order").  Pursuant to the Pretrial Order, the parties were required to submit a joint pretrial statement on or before June 30, 2025.  Pretrial Order, at ¶ 2.

Before the deadline to file the joint pretrial statement passed, prior counsel for the Plaintiff withdrew her appearance ("Prior Counsel") on June 24, 2025.  Order Withdrawing Attorney [Adv.

4

Dkt. No. 23].  At the hearing on the underlying motion to withdraw, the court noted to Prior Counsel that the upcoming trial was less than a month away at that time.  Prior Counsel assured the court that new counsel for the Plaintiff was aware of the nearing trial and prepared to proceed accordingly.

Yet, no joint pretrial statement as required by the Pretrial Order was filed.  Instead, on June 30, 2025, the Debtor separately filed her pretrial statement.  Defendant's Pre-Trial Statement [Adv. Dkt. No. 24] ("Defendant's Pretrial Statement").  The Debtor's counsel represented in Defendant's Pretrial Statement that Plaintiff's counsel did not plan to participate in the joint preparation of the pretrial statement, hence the individual pretrial statement.[3]

Despite the court's initial admonition that deadlines would not be moved as a result of the change in counsel, after hearing the Plaintiff's Motion to Extend Time [Adv. Dkt. No. 25], the court extended the pretrial statement deadline to July 10, 2025.  Order Extending Time [Adv. Dkt. No. 28].  Thereafter, the Plaintiff timely filed his pretrial statement.  Plaintiff's Pretrial Statement [Adv. Dkt. No. 29] ("Plaintiff's Pretrial Statement" and, together with Defendant's Pretrial Statement, the "Pretrial Statements").  Plaintiff's Pretrial Statement contained within it twenty-four paragraphs of stipulated facts signed by counsel for both the Plaintiff and the Defendant.  *Id.*, Exh. B (Joint Statement of Stipulated Facts (the "Stipulated Facts")).[4]

The Pretrial Statements contained lists of witnesses and exhibits that each party planned to offer into evidence at the trial taking place on July 14, 2025, and July 15, 2025 (the "Trial").[5]  The Plaintiff proposed twenty-three exhibits and the Debtor proposed forty exhibits.  Plaintiff's Pretrial Statement, Exh. E (Plaintiff Thomas Klonecki's List of Trial Exhibits); Defendant's Pretrial Statement, Exh. I (Defendant's List of Exhibits).[6]

The Pretrial Order required the parties to make note of any objection to witnesses and/or exhibits and the grounds for any such objection.  Pretrial Order, at ¶ 2.  By the express terms of the order, all exhibits to which no objections were raised in the pretrial statements would be admitted into evidence without the need to establish foundation and the failure to assert an objection would

---

[3]      The intentional failure of counsel to abide by a court order is an egregious breach of professional conduct standards.  If true, this allegation is very serious.  Counsel simply may not unilaterally choose to chart their own path in litigation when the court has instructed them how to proceed.  Counsel may always seek relief from such an order but may not ignore the court's instructions with impunity.  Because, however, no party has asked the court to address this issue and the court is therefore not fully apprised of the facts and circumstances beyond this allegation, the court will merely comment here on the lack of professionalism such conduct entails.

[4]      While the Pretrial Order required the parties to submit joint stipulated and agreed facts, given the fractured nature of the submissions, this was not attached to the Plaintiff's Pretrial Statement as an exhibit. The later-filed Stipulated Facts fulfills this requirement.

[5]      One of the obvious reasons the court orders joint pretrial statements is so that the facts that parties actually stipulate to match.  When parties disobey the court's scheduling orders and file independent pretrial statements, they each run the risk that the court, when forced to choose between unmatching stipulated facts, will not choose in their favor.

[6]      References to trial exhibits in this Adversary will be noted as "Px. ___" (in the case of Plaintiff's exhibits) or "Dx. ___" (in the case of Debtor's exhibits), as applicable.

result in the waiver of any prehearing or evidentiary objections that could have been raised by such deadline. *Id.* at ¶ 6. Despite the admission of exhibits by default, the Pretrial Order also provided that if the parties failed to use any exhibit at the Trial, the court would not afford such exhibits, even though admitted, any weight. *Id.* Perhaps because of the way in which the pretrial statements were handled, neither party raised any objections to the proposed exhibits in their pretrial statements. Nor did they raise any objections at the start of the Trial and, as a result, all exhibits were admitted. Nonetheless, at the commencement of the Trial, the court admonished the parties that they remained responsible for communicating to the court by way of the Trial the weight and relevance of any exhibit so admitted.

The court conducted the Trial on the matter beginning on July 14, 2025, and concluding on July 15, 2025.[7] During the Trial, the court heard from four witnesses, as follows:

> For the Plaintiff:
>
> Thomas Klonecki, the Plaintiff; and
>
> Lisa Durchin ("Durchin"), the spouse of the Plaintiff.
>
> For the Debtor:
>
> Mary Stephanie Schwarz, the Debtor; and
>
> Melvin Soster ("Soster"), the handyman used by the Debtor to help maintain her
>     rental properties.

On the request of the parties at the start of the Trial, each witness, when first called, was examined in full by each party, thus eliminating the need for the witness to be called for one case in chief and then recalled later for the other. Because each witness provided testimony in a mixed mode of examination, the parties were not limited on matters on cross.

Important to each determination are the underlying facts and the court's findings involving the credibility of these witnesses. *Deady v. Hanson (In re Hanson)*, 432 B.R. 758, 776 (Bankr. N.D. Ill. 2010) (Squires, J.) (the court "is in the best position to assess the credibility of the witnesses and weigh the evidence.") (*citing Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 575 (1985)), *aff'd,* 470 B.R. 808 (N.D. Ill. 2012). As such, the court will make initial observations below regarding each witness, with more detailed observations later as individual factual assertions are discussed.

The first witness called by the Plaintiff was Thomas Klonecki, the Plaintiff himself. A fair amount of the Plaintiff's testimony was spent working through his exhibits and the timeline of events. As he explained, the Plaintiff sold his primary home in the summer of 2022 and purchased a house that was then being remodeled but which was not yet completed before the sale was finalized. That resulted in a period of a few months that the Plaintiff and his family were without a home,

---

[7]     Though no party arranged for a live court reporter for the Trial or arranged for a transcript to be included in the matter's docket, *see* Pretrial Order at ¶ 7, at the court's request a transcript for the Trial was produced for the court and is relied on and cited to herein by the court. The transcript of the Trial consists of two volumes on the docket. Transcript of Proceedings Before the Honorable Timothy A. Barnes, vol. 1 (July 14, 2025) [Adv. Dkt. No. 33], vol. 2 (July 15, 2025) [Adv. Dkt. No. 34] (collectively, the "Transcript"). Citations to the Transcript herein are in the format of "Tr., July [14 or 15], pp. [X–Y]."

giving rise to his need for a short-term property rental. The Plaintiff ultimately found the Property and contacted the Debtor. In his testimony, the Plaintiff described his communications with the Debtor with respect to the Property and his understanding of the leasehold terms based on texts and emails with the Debtor. The court notes that the Plaintiff's testimony was at times credible and at times stretched credibility beyond reasonable limits. Those instances are discussed in more detail below.

The Plaintiff next called Durchin, the Plaintiff's wife. Durchin testified as to the condition of the Property when they moved in and her communications with Richard "Dick" Glidden ("Glidden"), a property manager who worked with the Debtor.[8] Although there were no photos of the Property when Durchin and the Plaintiff moved in, she testified that she was surprised at the state of the Property because it was not clean or well-maintained. According to Durchin, there was considerable wear and tear throughout the Property, with broken tiles and flaws in the paint and carpet. Durchin further testified that they were limited from using the full Property because, of the six garage bays on the Property, four were already in use by the Debtor in storing furniture, boxes and other personal effects. These complaints do not appear to have been communicated to the Debtor or any other party during the term of the leasehold. Instead, the limited communication from Durchin was by texts with Glidden related to moving out early and the return of their security deposit. Durchin's testimony lacked the credibility of the Plaintiff's. She was evasive and confrontational, and struck the court as a person more interested in taking her pound of flesh from the Debtor than one dedicated to presenting the court with a true account of what transpired.

The Plaintiff then called the Debtor as his last witness. As with the Plaintiff's testimony, there were aspects of the Debtor's testimony that were credible, including her admissions that did not ultimately support her case. Each are discussed in more detail below.

The Debtor testified in detail as to her work history and how she managed her businesses. The Debtor testified as to what she was doing professionally in July 2022. In particular, she was actively renting eight properties (at a value of $56 million in real estate) across three states and was involved in directing a movie. To manage her responsibilities, the Debtor had people working with her, including assistants who would communicate on her behalf and contractors to work on the rental properties with landscaping and repairs. The Debtor appears to have been alone in managing the finances of her rentals and testified to where and how she kept the funds received from tenants. The Debtor testified not just about receiving payments from the Plaintiff, but also as to her history as a landlord. Such history includes a lawsuit in Ohio and her experience with security deposits and knowledge of state landlord-tenant ordinances.

As part of her testimony, the Debtor testified that in July 2022, she had approximately nine bank accounts between both JP Morgan Chase and Fidelity. The specific bank accounts relevant to the issue here are a JP Morgan Chase bank account with an account number ending in 0919 (the "Chase Account") and a Fidelity bank account with an account number ending in 8659 (the "Fidelity Account"). The Debtor used the Fidelity Account to hold money for business purposes. Tr., July 14, pp. 272–73. The Debtor would also use the Fidelity Account to hold security deposits provided

---

[8]   Glidden was not officially employed by the Debtor or her business other than providing favors, which included working out tenant issues and helping with communications. *See, e.g.,* Px. 21; Tr., July 14, p. 228.

to her by tenants.  *Id.*  In the course of the Debtor's businesses, she would transfer money between the accounts.

It came out during the Debtor's testimony that the account statements for the Fidelity Account were not provided to the Plaintiff during discovery.  As a result, the Plaintiff then moved by oral motion to exclude the Fidelity Account and to preclude the Debtor from testifying as to the true designation of those funds and the nature of that account.  Tr., July 15, p. 298.  The Plaintiff argued that the Fidelity Account goes to the heart of his argument because the Debtor's use or misuse of the security deposit is a direct contributing issue to larceny and defalcation under Counts II and III.

The Plaintiff's oral motion was predicated under Civil Rule 37(c)(1).  Fed. R. Civ. P. 37(c)(1) (made applicable to bankruptcy matters by Fed. R. Bank. P. 7037).  Civil Rule 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless."  *Id.*  Civil Rule 37(c) goes on to say that "[i]n addition to *or* instead of this sanction, the court, on motion and after giving an opportunity to be heard: . . . (b) may inform the jury of the party's failure[.]"  *Id.* (emphasis added).  As this matter is a bench trial, the role of the jury is performed by the judge and, as the Seventh Circuit has made clear, judges are better situated than juries to sift through murky evidence that might otherwise be kept from juries.  *United States v. King*, 910 F.3d 320, 328 (7th Cir. 2018) (allowing, despite confrontation clause, hearsay evidence in criminal bench trial); *accord Pable v. Chicago Transit Auth.*, Case No. 19 CV 7868, 2024 WL 3688708, at *8 (N.D. Ill. Aug. 7, 2024), *aff'd,* 145 F.4th 712 (7th Cir. 2025) (determinations under Civil Rule 37 that might be left to a jury in some circumstances are determined by the court in a bench trial).

As a result, the court granted the Plaintiff's oral motion in part to the extent that the court, as the finder of fact, would take into account the party's failure when considering the Fidelity Account statements.  In granting the oral motion, the court noted that the request was not fully granted as there is no prejudice to the Plaintiff resulting from the nondisclosure, as the Plaintiff did not fully plead an action relating to the handling of the security deposit.

As explained more fully below, the court found that the inability for a tenant to be provided double damages under violations of both subsections of CCRTLO section 42-811(M) and the failure to affirmatively plead an action under the second subsection meant that the ruling did not prejudice the Plaintiff.

The Debtor's testimony then continued.  She testified as to the work done on the Property prior to the Plaintiff taking possession and she alleged damages to the Property only discovered after the Plaintiff vacated the Property.  While the Debtor was able to testify as to her perception of what the Property issues were, the court sustained a hearsay objection to the use of a collection of photos taken in and around the Property (the "Photos"), Dx. 6, to supplement that testimony as the Debtor did not take the Photos.  Tr., July 15, pp. 350–351.  The Photos, while they provided descriptions of what each Photo contained, also were undated.  Dx. 6.

At the conclusion of the Debtor's testimony, the Plaintiff rested.  While counsel to the Debtor at that time stated that he was "tempted" to move by oral motion for judgment on partial findings under Civil Rule 52, he did not do so.  Tr., July 15, pp. 442–43.  The court noted, as a

8

motion for judgment on partial findings would be difficult to determine given the mixed modes of presentation, the court would have "decline[d] to render any judgment until the close of the evidence." Fed. R. Civ. P. 52(c) (made applicable to these proceedings by Bankruptcy Rule 7052).

The Debtor then called Soster as her first and only witness not previously called in conjunction with the Plaintiff's case. Soster was a caretaker of sorts for the Debtor's properties, having a history of home remodeling and having worked with the Debtor on her rental properties since 2017. Soster testified about the work he did on the Property leading up to the Plaintiff moving in. He walked through the work he did in and around the Property and how the condition of the house was "great" prior to the Plaintiff taking possession. It was clear from his testimony that he knew the work he did and takes pride in his job. Soster was the only witness who appeared to testify without animus and with a genuine desire to be truthful. The court had no reason to question his testimony.

Soster then testified as to the Property's condition when he returned to do work after the Plaintiff left.[9] When Soster testified as to the condition of the Property after the Plaintiff vacated it, he was upset at the condition of the house compared to how it was when he finished his work prior to the Plaintiff moving in.

Finally, Soster walked through bank statements and an invoice he provided to the Debtor to testify as to the money he received from the Debtor for work done on the Property. While the invoice is not dated and does not provide which tenant the turnover is for, he testified that it was for work done on the Property related to the Plaintiff's rental. As stated above, the court has no reason to question Soster's testimony about the work he did on the Property or the invoice.

After testimony was taken, the parties presented their respective closing statements orally. The Plaintiff, during his closing statement, moved by oral motion to amend the pleadings to conform to the proofs under Bankruptcy Rule 7015. Tr., July 15, p. 508. Specifically, the Plaintiff sought to amend the pleading to more properly address section 42-811(M)(2) of the CCRTLO. As explained below, parallel violations of sections 42-811(M)(1) and (M)(2) do not allow for double recovery on those independent points. *Taylor-Kennedy and Kennedy et al., v. Frempong* (*In re Frempong*), 460 B.R. 189, 199 (Bankr. N.D. Ill. 2011) (Schmetterer, J.) (*citing Krawczyk v. Livaditis*, 366 Ill. App. 3d 375 (2006)). Further, the evidence presented only supported recovery for a violation of section 42-811(M)(1). Recovery under section 42-811(M)(2) has statutory predicates to proceed on that were not met based on the evidence presented. In particular, the tenant must provide written notice to the landlord of the landlord's failure to comply with the section. CCRTLO § 42-811(M)(2). No evidence of such a written notice was offered by the Plaintiff. As a result, the oral motion was denied. Tr., July 15, pp. 509–10.

At the conclusion of the Trial, the matter was taken under advisement. This Memorandum Decision constitutes the court's determination after the Trial of the matters in the Complaint and concludes all open issues in the Adversary.

---

[9]     For some inexplicable reason, the Debtor again attempted to use the Photos for Soster's testimony and, not inexplicably, the Plaintiff again objected. The court sustained the objection as Soster had to testify as to his own recollection and his own description of the Property condition, not simply confirm a picture. Tr., July 15, p. 456.

FINDINGS OF FACT[10]

From the review and consideration of the procedural background, as well as the evidence presented at the Trial and the filings in this Adversary, the court determines the salient facts to be and so finds as follows:

A.     The Debtor

1.     The Debtor is an experienced landlord who, during the year 2022, was renting eight properties in the following three states:  Ohio, California and Illinois.  Tr., July 14, p. 175; Tr., July 15, p. 417.  In total the Debtor managed real estate valued at $56 million and had entered into thousands of rental agreements.  Tr., July 14, p. 175.

2.     To rent the properties, the Debtor used online sites such as Airbnb, Vrbo and Zillow, used outside realtors and would also have repeat tenants.  *Id.* at p. 171.

3.     The Debtor had a real estate attorney to help navigate the laws in Illinois.  *Id.* at p. 177.

4.     From mid-June 2022 to mid-August 2022, the Debtor lived in California and was involved in filming and producing a Hollywood movie.  *Id.* at p. 210; Tr., July 15, p.  331.

5.     The Debtor had assistants who worked for her as independent contractors to help manage her rental business.  Tr., July 14, pp. 171–72.  Those assistants would help manage the conversations with possible tenants for different rental opportunities, but ultimately it was the Debtor who signed the leases and received the proceeds from said rentals.  *Id.* at pp. 172–73.

6.     In July of 2022, the Debtor had approximately nine bank accounts between JP Morgan Chase and Fidelity.  *Id.* at pp. 216–17.

7.     The Debtor's Fidelity Account is used by the Debtor for mixed business purposes, including to hold money for investors and sometimes the security deposits received by tenants.  *Id.* at pp. 272–73.  The Fidelity Account was to hold money that the Debtor did not want a debit card attached to.  *Id.*  The Debtor had no account solely dedicated to holding security deposits.  *Id.*

8.     The Debtor used the Chase Account for operations related to some of her rental properties, including the Property.  *Id.* at pp. 271–72.  The Chase Account was used to receive rent and to pay for work done on the rental properties including lawn care, cleaning and other reimbursements.  Tr., July 14, p. 274; Tr., July 15, pp. 402–05; Px. 9.

---

[10]     Adjudicative facts may also be found and determined throughout this Memorandum Decision.  To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are adopted as such.

B.        The Unsigned Lease and the Property Rental Period

9.       On or before July 1, 2022, the Debtor listed the Property for rent online via Airbnb. Stipulated Facts, at ¶¶ 18–19.  The Plaintiff and the Debtor first communicated about renting the Property on Airbnb.  Tr., July 14, pp. 40–41.

10.      The Debtor and the Plaintiff subsequently communicated via email and text about the leasehold.  Stipulated Facts, at ¶ 11.

11.      The Debtor requires payment in full for short-term leases which the Plaintiff agreed to.  Px. 1.

12.      On July 7, 2022, the Debtor emailed the Plaintiff that the current end date for their proposed tenancy was September 16, 2022.  *Id.*

13.      On July 8, 2022, the Debtor prepared and the parties subsequently entered into discussions regarding a written "Illinois Residential Lease Agreement," Dx. 2 (the "Unsigned Lease"), but no party has presented to the court a signed copy of it and it was apparently not signed by either party.  *Id.*; Stipulated Facts, at ¶ 12.

14.      The rental price for the Property was set at $8,500 per week with an additional $10,000 due for the required security deposit.  Stipulated Facts, at ¶¶ 14–15.

15.      The Unsigned Lease states that the leasehold term will begin on August 5, 2022, and will terminate on September 19, 2022.  Dx. 2.

16.      On July 8, 2022, the Plaintiff texted the Debtor asking for a copy of the Unsigned Lease so that he could change it to five weeks from six weeks and that he intended to wire the money.  Px. 7.  In response, the Debtor said that he "can just make the change and initial[.]"  *Id.*

17.      On July 11, 2022, the Plaintiff sent an email to the Debtor that purports to include the Unsigned Lease and includes a comment from the Plaintiff that he had updated the move-out time.  Px. 3.  No party presented to the court that updated, Unsigned Lease.

18.      The Plaintiff sent the Debtor a total of $52,500, with half sent on July 11, 2022, and the other half sent on July 15, 2022.  Stipulated Facts, at ¶¶ 16–17.  Both payments by the Plaintiff were sent to the Debtor's Chase Account.  Tr., July 14, p. 267.

19.      After July 15, 2022, the Plaintiff sent no further funds to the Debtor, nor did the Debtor demand any further payment from the Plaintiff.  Stipulated Facts, at ¶ 17.

20.      The Plaintiff moved into the Property and commenced his tenancy on August 5, 2022.  Tr., July 14, p. 71; Tr., July 15, pp. 372–73.

21.      The Debtor transferred $10,000 from her Chase Account to her Fidelity Account on August 8, 2022.  Tr., July 14, p. 272; Tr., July 15, pp. 423–24; Px. 9.

22.     On August 9, 2022, Durchin communicated with Glidden to seek an early end of the Property let.  Px. 21.

23.     On August 11, 2022, the Debtor communicated to the Plaintiff about the request to move out early from the Property.  Dx. 23.

24.     On August 18, 2022, the Plaintiff texted the Debtor that they are confirmed to move out on September 13, 2022.  Px. 7.

C.     The Move-out

25.     The Plaintiff physically vacated the Property on September 13, 2022.  Tr., July 14, pp. 161–62.

26.     On September 25, 2022, twelve days after vacating the Property, the Plaintiff requested the return of his security deposit from the Debtor.  Px. 6.

27.     Four days later, the Debtor responded that she had to have the carpets cleaned and would provide a check to the Plaintiff after cleaning the Property.  Id.

28.     The Plaintiff immediately responded on the same day, asking the Debtor what issues were found with the Property after their rental term.  Id.

29.     The Plaintiff emailed the Debtor asking for an update on the return of the security deposit on September 29, 2022, October 31, 2022, and November 13, 2022, each without any response back from the Debtor.  Id.

D.     Damage to the Property

30.     Soster returned to the Property in September after the Plaintiff vacated and the carpet was ruined due to urine, the walls were damaged with holes and the garage track was bent.  Tr., July 15, pp. 453, 457.

31.     The work done by Soster to clean the Property in September after the Plaintiff vacated was not the ordinary cleaning he would do after a tenant vacated a rental property.  Id. at pp.  457–58.

32.     Following the work done on the Property immediately following the Plaintiff moving out, Soster sent the Debtor an invoice bill from "Mels Handyman Services" for the repairs done on the Property.  Dx. 14 (the "Invoice").

33.     The Invoice did not provide a date but listed the Property, described the bill as being for "Tenant Turnover" and listed itemizations for work done.  Id.

34.     The individual itemization amounts billed in the Invoice were:  $2,700 and $500 for painting, $1,500 for garage door repairs and $800 for the repair of walls, carpet and sectional.  Id.  The total bill for the Invoice was $5,500.  Id.

35.     The $5,500 in repairs done by Soster are all associated with the Plaintiff's rental of the Property.

12

DISCUSSION

The three Counts of the Complaint assert claims under section 523(a) of the Bankruptcy Code, each seeking to prevent the discharge an alleged debt owed to the Plaintiff by the Debtor. There must first be a debt to discharge, however. Before the issue of dischargeability can be reached, the court must first take up whether and to what extent a debt is owed. Only after will the court determine whether a debt, if owed, is discharged.

A.    Debt

"The Bankruptcy Code defines 'debt' very broadly, as 'liability on a claim,' 11 U.S.C. § 101(12), and 'claim' very broadly, as any 'right to payment,' whether liquidated or unliquidated, disputed or undisputed, legal or equitable. [11 U.S.C.] § 101(5); *see generally Johnson v. Home State Bank*, 501 U.S. 78, 83–84 and n. 5 (1991)." *McClellan v. Cantrell*, 217 F.3d 895 (7th Cir. 2000). The elements contained in these two definitions are governed by state law. *Blazek v. Kubin (In re Kubin)*, Case No. 18-02853, 2022 WL 1467643, at *6 (Bankr. N.D. Ill. May 9, 2022) (Thorne, J.) ("[T]here is no debt at all unless the creditor has a 'right to payment' under state law.").

Here, the Plaintiff asserts that he is owed $90,000 but provides no easily cognizable method as to how this amount was calculated. It appears to be based on the default judgment entered in his favor by the Circuit Court, which judgment was subsequently vacated. The Debtor, in turn, appears to deny that a debt exists by arguing that no security deposit was ever paid. That argument does not match what the evidence at the Trial showed.

1.    *The Terms of the "Lease"*

Though, unfortunately, no binding, written lease was ever entered into between the parties, there can be no question that the parties did enter into a landlord-tenant relationship with respect to the Property. In fact, the parties stipulated that they are governed by the CCRTLO and, in accordance with that ordinance, the Debtor is a "Landlord" under section 42-803(A)(3) and the Plaintiff is a "Tenant" under section 42-803(A)(12). Stipulated Facts, at ¶¶ 18–19. Each party, however, disputes the agreed term of the relationship and if a deposit was given (and if so, how much was given).

Begin with the uncontroverted evidence: Prior to entering into the transaction, the parties discussed a rental rate of $8,500 a week and a $10,000 deposit. Stipulated Facts, at ¶¶ 14–15. In that regard, the Plaintiff paid $52,500 to the Debtor, with half sent on July 11, 2022, and the other half sent on July 15, 2022. *Id.* at ¶¶ 16–17.

Despite her own testimony and evidence that she treated $10,000 of the $52,500 paid by the Plaintiff as a deposit, Tr., July 14, p. 272; Tr., July 15, pp. 423–24; Px. 9, the Debtor later testified that the Plaintiff in fact never paid a security deposit. Tr., July 15, p. 307. At the agreed upon weekly rate of $8,500 to which the parties stipulated, there is simply no math that would make the payment of $52,500, an amount that the Debtor never protested or sought correction of, make sense without that deposit.

The Plaintiff, on the other hand, testified that he believed the leasehold term was five weeks at $8,500 with a security deposit of $10,000. Tr., July 14, pp. 52, 61–62. Those are the numbers the

13

parties negotiated, Stipulated Facts, at ¶¶ 14–15, and they add neatly to the amount actually paid ($42,500 for five weeks at $8,500/week plus a $10,000 deposit for a total of $52,500).

Now consider what actually transpired here regarding the term of the leasehold. The Plaintiff took occupancy on August 5, 2022. Tr., July 14, p. 71. He vacated on September 13, 2022, for a total term of five-weeks and four-days. Tr., July 15, pp. 372–74.

While the Debtor attempted to reason in her testimony that the leasehold term was longer to bolster her claim that no deposit was paid, that testimony is both entirely unconvincing and not aligned with the facts. If the leasehold term was six weeks, the total rent due would have been $51,000 at the agreed $8,500/week rate. If seven, it would have been $59,500. For the payment of $52,500 to consist only of rent, the term would have had to have been at least six weeks plus a full day and a partial additional day. That exact amount makes no sense and the Debtor's failure to protest an entire, larger rent payment or lack of payment of a deposit at all makes the Debtor's testimony in this regard appear to be a clear attempt at deception. Yet the Debtor testified that she believed the term of the leasehold ran until September 19, 2022. That would be six weeks and three days. Again, no math supports that position and the Debtor's own actions belie such a term.

The Plaintiff, however, is not entirely without blame. If, as the Plaintiff testified and the amounts seem to support, the term of the leasehold was five weeks, then the leasehold would have expired on September 9, 2022. The Plaintiff did not exit the property until September 13, 2022, however. Durchin communicated with Glidden on August 9, 2022, to negotiate an early exit from the Property. Px. 21. The Debtor confirmed receipt of this communication with the Plaintiff on August 11, 2022. Dx. 23. That is more consistent with the term being longer than five weeks, because if the term were five weeks, the Plaintiff would have needed an extension, not a reduction, of the leasehold term.

All told, the evidence (though conflicting) supports more the conclusion that the term of the leasehold was five weeks (the "Term"), that the Plaintiff prepaid all of that rent plus a $10,000 deposit (the "Deposit") and that the Plaintiff overstayed the Term by four days.

2. *The Amount Due under the "Lease"*

At the outset of the discussion of this matter, the court considered whether and what the leasehold Term was and whether and what, if any, the Deposit was. As discussed above, the logical conclusion is that the Term was for five weeks, the weekly rental was $8,500 and the Deposit was $10,000. All of this was paid when the Plaintiff paid $52,500 in two installments.

At the close of the leasehold Term, the Debtor was required to return the Deposit of $10,000. She failed to do so and she failed to account for any retention of the $10,000. So, we begin with the Debtor owing $10,000 to the Plaintiff.

Not so fast, though. The CCRTLO allows a landlord to deduct certain amounts from a security deposit before returning it to the tenant. First, a landlord may deduct "[a]ny unpaid rent that has not been validly withheld or deducted[.]" CCRTLO § 42-811(C)(1). Second, a landlord may deduct "[a]ny reasonable amount necessary to repair any damage caused to the premises by the tenant . . . reasonable wear and tear excluded." CCRTLO § 42-811(C)(2).

14

Based on that discussion above, the Plaintiff overstayed the Term of the leasehold by four days. At the agreed upon $8,500/week rental rate, the per diem rent would be $1,214. Thus, the Plaintiff would have owed the Debtor $4,856 in total for those extra four days of rent. Had the Debtor complied with the CCRTLO, the Debtor would have been entitled to deduct this unpaid amount of rent from the Deposit. CCRTLO § 42-811(C)(1). As such, had the Debtor complied with the CCRTLO, she would have only owed the Plaintiff $5,144, the net amount of the Deposit.

The Debtor would also have been entitled to deduct from the Deposit the cost of remedying any actual damage to the Property, above normal wear and tear. CCRTLO § 42-811(C)(2).

At the Trial, the parties testified as to the condition of the Property both before and after the Plaintiff's tenancy. Much of the testimony was conflicting and unsupported. Soster's testimony surrounding the condition of the Property before and after the Plaintiff's tenancy was the most credible and is given the most weight. Although the Invoice did not have a date, Soster's testimony gave it weight and helped to demonstrate that there were damages to the Property, and those damages are calculable. Based on the Invoice and Soster's own testimony, the cost of repairing damage to the Property totaled $5,500. That amount was calculated by going through the Invoice itemization. Based on Soster's testimony and the Invoice, he billed $2,700 and $500 for painting done on the Property, $1,500 for garage door repairs and $800 for the repair of walls, carpet and sectional.

The Debtor testified regarding other damage that required repair, such as to the pool, but neither the evidence presented nor the testimony on this point was credible. For instance, at the Trial the Debtor testified regarding a list of work that may have been done on the Property after the Plaintiff moved out. Tr., July 15, pp. 348–49; Dx. 5. That list was prepared by a third-party who went through the Debtor's bank statements and was not based on actual invoices. *Id.* In fact, the Debtor herself testified that not all of the items marked were expenses likely associated with the Plaintiff's tenancy, including some of the damage to the pool. *Id.*[11] Such damage will therefore not be considered. The Debtor may only deduct from the Plaintiff's award the work done by Soster and calculated by the Invoice. As such, the total amount for damages that can be deducted from the Deposit is $5,500.

This means, however, that the remaining amount of the Deposit, after deducting the unpaid rent, is insufficient to cover the damages to the Property. Had the Debtor complied with the CCRTLO, the Plaintiff would owe the Debtor $356.

---

[11]     Whose responsibility maintenance of the pool was, in and of itself, is a difficult question that neither of the parties answered. The Debtor simply presumes that maintenance of the pool was the Plaintiff's responsibility. Yet the Unsigned Lease was silent as to whether it was the Debtor or the Plaintiff who would have been responsible for the maintenance of the pool. This should have been addressed by the parties, both in the Unsigned Lease and certainly in the Trial. In the absence of a contractual provision, the maintenance *might* fall on the Plaintiff (as a routine maintenance of property in the exclusive use of the Plaintiff) or *might* fall on the Debtor (as an extraordinary maintenance item). As it is the Debtor who seeks to establish that the pool maintenance was the Plaintiff's responsibility and has failed to do so, the Debtor will not be permitted to assess pool maintenance or repair costs against the Plaintiff.

15

3.      *Damages under the CCRTLO*

The Debtor did not, however, comply with the CCRTLO and, as such, the court must consider how that failure to comply changes the foregoing calculation, if at all.  The CCRTLO states that:

(M) If the landlord fails to comply, the tenant shall have a right to seek damages.

      (1)     If the landlord fails to comply with subsections 42-811(A), 42-811(B), and 42-811(C), the tenant shall be awarded damages in an amount equal to two times the security deposit and reasonable attorney's fees. This section does not preclude the landlord or tenant from recovering other damages to which they may be entitled under this Article.

      (2)     If the landlord fails to comply with one or more of the administrative requirements as set forth in subsections 42-811(D) through 42-811(L), the tenant may notify the landlord of the landlord's failure to comply with this section by written notice. Within two business days after the receipt of the tenant's written notice, the landlord shall remedy and provide the administrative requirements as described in those sections. The written notices required by this section may be delivered electronically if the parties have previously communicated electronically. The written notice from the tenant to the landlord must include that there has been a breach of the rental agreement and that the landlord must remedy the breach within two business days after the tenant delivered the written notice or face damages. If the landlord fails to remedy within two business days, the tenant shall be awarded damages in an amount equal to two times the security deposit and reasonable attorney fees. This section does not preclude the landlord or tenant from recovering other damages to which they may be entitled under this Article.

CCRTLO § 42-811(M)(1), (2).  Section 42-811(M) of the CCRTLO therefore provides two parallel but independent provisions under which a tenant may seek damages.  The first question these provisions raise is whether a tenant is entitled to recover both under sections 42-811(M)(1) and 42-811(M)(2).  This question was addressed in the context of the *Frempong* court's reading of the Chicago Residential Landlord & Tenant Ordinance (the "Chicago Ordinance").  *Frempong*, 460 B.R. at 199.  Section 5-12-080(a) of the Chicago Ordinance deals with security deposits and is largely parallel to the CCRTLO's provisions in section 42-811(M).

In *Frempong*, the court held that a single award is proper for multiple violations of section 5-12-080 of the Chicago Ordinance, stating that "only one penalty of two-times the deposit is awarded even if more than one subsection is violated." *Frempong*, 460 B.R. at 199.  In *Krawczyk*, which *Frempong* relied on, the Illinois appellate court held that, under the Chicago Ordinance section 5-12-080, there was a single statutory recovery for security deposit violations but there could also be recovery for other violations of the same ordinance added on. *Krawczyk*, 366 Ill. App. at 378.

16

Given the parallel aspects of the CCRTLO and the Chicago Ordinance in this regard, the court has no reason to believe that the reasoning of the Illinois appellate court in *Krawczyk* would be any different with respect to the CCRTLO, and thus the reasoning of *Frempong* would apply here as well. Thus a plaintiff might be responsible for double damages under section 42-811(M)(1) or under section 42-811(M)(2), but not both.

Considering then the damages provisions, themselves, under section 42-811(M)(1), there are three subsections of the CCRTLO that, if the landlord violates them, will allow the tenant to be awarded damages. The first subsection deals with the amount of the security deposit and is not at issue here. CCRTLO § 42-811(A). The second subsection deals with when the rent shall be paid and is also not at issue here. CCRTLO § 42-811(B). The third subsection deals with the return of the security deposit and is directly at issue here. CCRTLO § 42-811(C). Under this subsection, if the Debtor failed to return or account for the Deposit and thus comply with the provisions of section 42-811(C), the Plaintiff "shall be awarded damages in an amount equal to two times the security deposit and reasonable attorney's fees." CCRTLO § 42-811(M)(1). As was dicussed above, the Debtor did in fact fail to comply with section 42-811(C).

The amount of the Deposit has been determined by the court to be $10,000. The wording of the CCRTLO makes clear that the penalty is calculated off of the gross amount of the Deposit, not the net amount due back to the Plaintiff after the deductions discussed above. Under section 42-811(M)(1), therefore, the Plaintiff is entitled to a statutory penalty of $20,000—two times the $10,000 Deposit.

As to section 42-811(M)(2), at the Trial, it was noted that the Plaintiff did not affirmatively plead for relief under section 42-811(M)(2). The Complaint did not make any allegations with respect to the second provision, merely including a block quote of the ordinance. Compl., at ¶ 62. Further, while the Plaintiff's Pretrial Statement supersedes his Complaint in most respects, *Gorlikowski v. Tolbert*, 52 F.3d 1439, 1443 (7th Cir. 1995); *see also Desmond v. Keebler (In re Keebler)*, 658 B.R. 908, 921 (Bankr. N.D. Ill. 2024) (Barnes, J.), the Plaintiff's Pretrial Statement only made a passing reference that the Debtor failed to segregate the Deposit. Plaintiff's Pretrial Statement, at ¶ 18.

Even assuming the Plaintiff had properly pled under section 42-811(M)(2), no evidence was offered by the Plaintiff as to the compliance with the express and detailed predicate of a recovery under section 42-811(M)(2), namely that the Plaintiff had provided the Debtor with notice sufficient to satisfy section 42-811(M)(2). That failure dooms any claim under section 42-811(M)(2). Nonetheless, as the Illinois courts would not allow recovery under both section 42-811(M)(1) and section 42-811(M)(2) (in essence, quadruple damages and double attorney's fees), *Frempong*, 460 B.R. at 199, the Plaintiff is not harmed by his failure.

So, under section 42-811(M), the Plaintiff is owed a statutory penalty of $20,000, twice the amount of the Deposit. But the right to recovery under "[t]his section does not preclude the landlord . . . from recovering other damages to which they may be entitled to under this Article." CCRTLO § 42-811(M)(1). Because section 42-811(M) allows the Debtor to apply her damages against the Deposit even in light of her noncompliance with section 42-811(M)(1), the Debtor is nonetheless able to deduct from the Deposit any "unpaid rent that has not been validly withheld or deducted[.]" CCRTLO § 42-811(C)(1). That amount is $4,856, as determined by the court above. Further, the Debtor is able to deduct from the deposit "[a]ny reasonable amount necessary to repair

17

any damage caused to the premises by the tenant . . . ."  CCRTLO § 42-811(C)(2).  That amount is $5,500, as determined by the court above.

So, the Debtor owes to the Plaintiff $19,644, which amount is the $20,000 statutory penalty minus the $356, the net amount the Plaintiff owes the Debtor after deducting the unpaid rent and permissible damages from the Deposit, as determined by the court above.  As was noted above, the Plaintiff sought $90,000.  As the CCRTLO does entitle tenants to recover what other damages the statute does provide in addition to the penalty, additional damages might be how the Plaintiff reached that amount.  But might be is not sufficient.  *Rude v. Westcott*, 130 U.S. 152, 167, 9 S. Ct. 463, 469, 32 L. Ed. 888 (1889) ("actual, not speculative, damages must be shown").  The Plaintiff has failed to show an actual entitlement to any damages exceeding the foregoing amounts.

The final question is what, if any, of the attorney fees are reasonable and can be awarded as damages owed to the Plaintiff by the Debtor.  When considering an award of attorney's fees, the fundamental principle is that each litigant is responsible for his own attorney's fees regardless of outcome.  *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126 (2015) (*quoting Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252–53 (2010)) ("The American Rule provides the 'basic point of reference' for awards of attorney's fees: 'Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise.'").  The CCRTLO clearly shifts that liability to the Debtor.  CCRTLO § 42-811(M)(1) ("If the landlord fails to comply . . . the tenant shall be awarded damages . . . and reasonable attorney's fees.").

While the Plaintiff argues he is entitled to reasonable attorney's fees, he did not provide the court with what that amount should be nor information to calculate the same.  Therefore, while the Plaintiff is entitled to attorney's fees under the CCRTLO, that amount cannot be determined at this time.  Pursuant to an order accompanying this Memorandum Decision, the court will establish a procedure by which such attorney's fees will be determined.  Such fees, once determined, will also be nondischargeable if the underlying debt owed is determined to be nondischargeable.  *Klingman v. Levinson*, 831 F.2d 1292, 1296–97 (7th Cir. 1987) (attorney's fees are nondischargeable under section 523(a)(4) if the underlying judgment the fee award attaches to is found to be nondischargeable); *Weinstein & Assocs., Ltd., v. Lymberopoulos (In re Lymberopoulos)*, 453 B.R. 340, 344 (Bankr. N.D. Ill. 2011) (Cox, J.) (same).

As a result, Debtor owes the Plaintiff a total debt of $19,644, plus reasonable attorney's fees to be determined at a later hearing.

B.      Dischargeability

Now that the issue of what debt is owed to the Plaintiff has been established, the court can take up the question of whether that debt is dischargeable.

We start with the presumption that, absent a court determination that an exception in the Bankruptcy Code applies, all debts of an individual debtor in a chapter 7 bankruptcy case will be discharged.  11 U.S.C. § 727(a).  Section 727 sets forth a number of exceptions, the most relevant being the exclusion from a debtor's discharge any debt found to be nondischargeable under section 523 of the Bankruptcy Code.  11 U.S.C. § 727(b).

18

In this matter, the Plaintiff seeks a finding from the court that the debt owed by the Debtor to the Plaintiff, as determined above, is nondischargeable under section 523. The burden here lies squarely with the Plaintiff. *Goldberg Sec., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992) ("The burden is on the objecting creditor to prove exceptions to discharge.") (citation omitted). The Plaintiff "must establish an exception to discharge by a preponderance of the evidence." *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 957 (Bankr. N.D. Ill. 1995) (Schmetterer, J.) (*citing Grogan v. Garner*, 498 U.S. 279, 291 (1991)). Exceptions to discharge are construed strictly against the objecting creditor and liberally in favor of the debtor. *In re Luster*, 50 F. App'x 781, 784 (7th Cir. 2002); *In re Crosswhite*, 148 F.3d 879, 881 (7th Cir. 1998).

Counts I, II and III of the Complaint all seek such relief, alleging different exceptions to the discharge of debt under sections 523(a)(2)(A) and 523(a)(4) of the Bankruptcy Code. As such, each will be taken up below.

1.      *Count I: 11 U.S.C. § 523(a)(2)(A)*

Section 523(a)(2)(A) provides, in relevant part, that an individual debtor is not entitled to discharge of any debt "(2) for money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained by – (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]"  11 U.S.C. § 523(a)(2)(A).

As written, the section sets forth three separate grounds for which a debt will not be dischargeable:  false pretenses, a false representation, or actual fraud. False pretenses and false representation, while each discreet categories, can be analyzed together. They may be established without establishing actual fraud. *McClellan*, 217 F.3d at 892–93. The court therefore first takes up false pretenses and false representation and only thereafter considers actual fraud.

a.      False Pretenses and False Representation

While false pretenses and false representations are quite obviously different, a number of the factors needed to establish them are the same. To successfully establish either, a creditor must show:  (1) that the debtor made a false representation or omission, (2) which the debtor (a) knew was false or made with reckless disregard for its truth and (b) made with the intent to deceive or defraud; and (3) the creditor justifiably relied on the false representation or omission. *In re Davis*, 638 F.3d 549, 553 (7th Cir. 2011). The creditor must establish all three elements to support either a finding of false pretenses or of false representation. *Attorneys' Title Guaranty Fund, Inc. v. Wolf (In re Wolf)*, 519 B.R. 228, 246 (Bankr. N.D. Ill. 2014) (Barnes, J.); *Baermann v. Ryan (In re Ryan)*, 408 B.R. 143, 156 (Bankr. N.D. Ill. 2009) (Squires, J.). The failure to establish any one element is outcome determinative. *Bletnitsky v. Jairath (In re Jairath)*, 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001) (Schmetterer, J.).

The case law regarding these two factors is, quite frankly, muddled. It appears that a false representation can give rise to false pretenses, but not all false pretenses arise from false representations. That would make the term false representation superfluous. *United States v. Miscellaneous Firearms, Explosives, Destructive Devices & Ammunition*, 376 F.3d 709, 712 (7th Cir. 2004) ("We will not construe a statute in a way that makes words or phrases meaningless, redundant, or superfluous."). A false representation is, quite obviously, a result of a representation, either spoken

or written.  *Muhammad v. Sneed (In re Sneed)*, 543 B.R. 848, 859 (Bankr. N.D. Ill. 2015) (Barnes, J.) ("[A] false representation is an express misrepresentation that can be demonstrated by a spoken or written statement . . . .") (citations omitted).  This can include the failure to make a representation of material fact.  *Hanson*, 432 B.R. at 772 ("A debtor's silence regarding a material fact can constitute a false representation under § 523(a)(2)(A).") (internal quotation omitted).  "A debtor's failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression." *Ryan*, 408 B.R. at 157; *Trizna & Lepri v. Malcolm (In re Malcolm)*, 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992) (Wedoff, J.).

False pretenses "include misrepresentation or conduct intended to create or foster a false impression."  *Hanson*, 432 B.R. at 771; *Mem'l Hosp. v. Sarama (In re Sarama)*, 192 B.R. 922, 927 (Bankr. N.D. Ill. 1996) (Squires, J.).  Overt misrepresentations are not required to establish false pretenses and, in fact, like false representation, silence or concealment may constitute false pretenses.  *Hanson*, 432 B.R. at 772.  That silence or concealment must "create a false impression which is known by the debtor."  *Sarama*, 192 B.R. at 928.  But false pretenses can include actions not in the nature of representations that nonetheless create or foster that false impression.  The implication arises when a debtor engages in "a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, . . . or understanding of a transaction, in which [the] creditor is wrongfully induced by [the] debtor to transfer property or extend credit to the debtor . . . ." *Sterna v. Paneras (In re Paneras)*, 195 B.R. 395, 406 (Bankr. N.D. Ill. 1996) (Squires, J) (internal quotations omitted).

Both false pretenses and false representation require reliance, though the Supreme Court has clarified that such reliance need only be "justifiable."  *Field v. Mans*, 516 U.S. 59, 73–75 (1995); *Handler v. Moore (In re Moore)*, 625 B.R. 896, 904 (Bankr. N.D. Ill. 2021) (Barnes, J.) (same).  "Under the justifiable reliance standard, a creditor has no duty to investigate unless the falsity of the representation would have been readily apparent."  *Ojeda v. Goldberg*, 599 F.3d 712, 717 (7th Cir. 2010).  It is not an objective standard but rather is determined by "looking at the circumstances of a particular case and the characteristics of a particular plaintiff."  *Id.*

In sum, to prevail on either of these two theories the Plaintiff must demonstrate by a preponderance of the evidence that (1) the Debtor made a false representation or omission (for either theory) or conduct (for false pretenses), (2) which the Debtor (a) knew was false or made with reckless disregard for its truth (in the case of either theory) or knew would create a false impression (in the case of false pretenses) and (b) made with the intent to deceive or defraud; and (3) the Plaintiff justifiably relied on the false representation, omission or conduct.

Here, the Plaintiff did not prove that the Debtor's conduct created a debt due to false representation or a false pretense.  There is no evidence showing that the Debtor never intended to return the Deposit at the end of the rental period.  Her similar actions in other rentals do not create a compelling trend and no facts specific to this case indicate such an intention.  Rather, the Debtor, though not in a manner compliant with state law (as discussed below), tried to segregate what she believed to be the Deposit by transferring $10,000 to her Fidelity Account.  Further, while the Debtor clearly mismanaged her rental business, no evidence exists of false pretenses or a false representation.  It is clear that the Debtor failed to keep proper records or manage her rentals effectively, but a party can simply be bad at business without engaging in actions that constitute false

20

pretenses or false representation.  Nothing demonstrates that the Debtor induced the Plaintiff to transfer her funds for any improper purpose.

The Plaintiff alleges that he justifiably relied upon the Debtor's deception.  However, no such deception was shown by the Plaintiff.  At the time of entering into the leasehold, nothing indicated that the Debtor would not return the Deposit except in circumstances where the Debtor was legally entitled to retain it.

As such, the Plaintiff did not prove by a preponderance of the evidence that he justifiably relied on any false representation or omission with respect to what the Debtor would do with the Deposit.  On this point, judgment on Count I must be rendered in favor of the Debtor.

> b.  Actual Fraud

Count I might still, nonetheless, succeed on actual fraud.  Actual fraud is broader than the foregoing and not limited to misrepresentations or reliance.  *Phlamm v. Mukenschnabl* (*In re Mukenschnabl*), 643 B.R. 218, 244 (Bankr. N.D. Ill. 2022) (Baer, J.) (citations omitted).  As such, a different analysis is required.  To except from discharge debt obtained by actual fraud, the objecting creditor must show that:  "(1) actual fraud occurred; (2) the Debtor intended to defraud the Plaintiff; and (3) the Debtor's actual fraud created the debt at issue." *Mukenschnabl*, 643 B.R. at 244; *Jairath*, 259 B.R. at 314.

The Seventh Circuit, while adopting the language of an earlier state court case, described fraud for purposes of section 523(a)(2)(A) as follows:

> 'Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.'

*McClellan*, 217 F.3d at 893 (*quoting Stapleton v. Holt*, 1952 Ok 408).

While fraud is difficult to define precisely for section 523(a)(2)(A), it "is best taken as some sort of intentional act of deception which impairs a creditor's ability to collect a debt, including a fraudulent transfer or conveyance scheme." *Ill. Dep't of Emp. Sec. v. Davis* (*In re Davis*), 668 B.R. 580, 602 (Bankr. N.D. Ill. 2025) (Barnes, J.) (*citing Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 360 (2016)).

Thus, in order to establish fraud, the Plaintiff must show here that (1) a fraud occurred, (2) the Debtor intended to defraud the Plaintiff, and (3) the fraud created the debt that is at issue. *Mukenschnabl*, 643 B.R. at 244.  Before taking up the other two factors, the court will first consider whether the Plaintiff has made the requisite showing of intent.

> c.  Intent

Scienter, or intent to deceive, is a required element under section 523(a)(2)(A) for proving whether the claim is for a false representation, false pretenses, or actual fraud.  *Mayer v. Spanel Intern. Ltd.*, 51 F.3d 670, 673 (7th Cir. 1995); *Davis*, 668 B.R. at 601 (same).  Whether a debtor's intent was

to deceive is measured by the debtor's subjective intention at the time of the alleged fraud. *Rae v. Scarpello (In re Scarpello)*, 272 B.R. 691, 700 (Bankr. N.D. Ill. 2002) (Squires, J.). The intent to deceive may be proven through direct evidence or inferred. *In re Sheridan*, 57 F.3d 627, 634 (7th Cir. 1995); *CFC WireForms, Inc. v. Monroe (In re Monroe)* 304 B.R. 349, 356 (Bankr. N.D. Ill) (Schmetterer, J.) (same).

Because direct proof of intent is rarely available, fraudulent intent can be established by circumstantial evidence. *Mukenschnabl*, 643 B.R. at 245; *Paneras*, 195 B.R. at 406. The intent to deceive "may be inferred from a false representation which the debtor knows or should know will induce another to advance money to the debtor." *Paneras*, 195 B.R. at 406 (internal citations omitted); *see also Sheridan*, 57 F.3d at 633. "Thus, fraud may be inferred if the circumstances collectively suggest that the debtor intended to cheat or otherwise deceive the plaintiff." *Mukenschnabl*, 643 B.R. at 245.

Much of the Plaintiff's argument is that the Debtor made such misrepresentations or omissions with the intent to deceive the Plaintiff and defraud him. The Plaintiff argues that the Debtor had a history of wrongfully retaining tenant security deposits which shows an intent to defraud the Plaintiff here. The Plaintiff further argues that the Debtor never intended to return the Deposit at the time the leasehold was agreed to. But these arguments are unavailing.

First, there was no evidence at the Trial that the Debtor had a pattern of wrongfully retaining tenant security deposits. While the Plaintiff did make much of one instance of a lawsuit against the Debtor and one of the counts was related to the mishandling of a security deposit, *see Kissinger v. Schwarz*, Case No. CV 19 921223 (Cuyahoga County Ct. of Common Pleas, Sept. 10, 2019) (the "Ohio Lawsuit"); Px. 20, at ¶ 25, considering the Debtor's unimpeached testimony that she had entered into thousands of rental agreements, Tr., July 14, p. 175, one or two instances do not make a pattern.

What the evidence at the Trial showed was that the Debtor was careless in her business practices. For instance, the Debtor's failure to obtain a signed lease, failure to properly handle the Deposit, overall laxness in her communications with the Plaintiff and failure to respond appropriately to the Plaintiff's demands for the return of the Deposit all evidence negligence more than they do intent. The evidence does not show that, at the time she let the Property to Plaintiff, the Plaintiff intended to not handle the Deposit appropriately.

For the foregoing reasons, the Plaintiff has not established by a preponderance of the evidence that the Debtor knowingly made false representations or omissions which she knew or should have known would induce the Plaintiff to enter into a rental agreement and pay a security deposit for the Property. As the Debtor has failed to establish intent, the court need not consider the other elements of actual fraud. The Debtor's case for actual fraud is insufficient.

As the Plaintiff's case has failed on each element of Count I of the Complaint, judgment will therefore be entered in favor of the Debtor as to Count I.

2.      *Count II and III:  11 U.S.C. § 523(a)(4)*

Section 523(a)(4) provides other exceptions to discharge "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). There are,

therefore, three separate grounds that will allow a debt to be excepted from discharge under this section.  To demonstrate that a claim is excepted from discharge under section 523(a)(4), the objecting creditor must prove that the debtor committed:  "(1) fraud or defalcation while acting as a fiduciary; or (2) embezzlement; or (3) larceny." *Burke v. DeFranco* (*In re DeFranco*), 658 B.R. 470, 485 (Bankr. N.D. Ill. 2024) (Baer, J.).

The Plaintiff does not advance an argument under embezzlement.  For the remaining two grounds, the court will consider first larceny and then fraud or defalcation, each in turn below.

a.      Count II:  Larceny

Larceny, for the purposes of section 523(a)(4), is defined by federal common law.  *In re Rose*, 934 F.2d 901, 903 (7th Cir. 1991).  "Larceny is proven for § 523(a)(4) purposes if the debtor has wrongfully and with fraudulent intent taken property from its owner." *Id.*  The objecting creditor must show that the debtor had the "fraudulent intent to convert such property to its own use without the owner's consent." *John Deere Co. v. Broholm* (*In re Broholm*), 310 B.R. 864, 877 (Bankr. N.D. Ill. 2004) (Schmetterer, J.) (*citing Rose*, 934 F.2d at 903).  The required intent for larceny is specific, and it requires more than proving general deceit.  *In re Fara*, 663 B.R. at 723.

The Plaintiff argues that the Debtor took the Deposit and failed to return it with the intention to deprive him of the same.  The Plaintiff again points to the Ohio Lawsuit in which the Debtor was sued for failure to return a security deposit.  However, in the same manner as the Plaintiff's section 523(a)(2)(A) argument failed, the Plaintiff's case falters with respect to the Debtor's intent.  At the Trial, no evidence was submitted or produced through testimony to support the Debtor's intent to convert the Deposit for her own use.  At most, the court is asked to infer intent from the existence of the Ohio Lawsuit and the fact that the Debtor did not return the Deposit when asked.  None of the testimony by any of the parties showed that the Debtor obtained the Deposit through deceit nor attempted to convert that Deposit, and the court finds the inference requested to be too attenuated.

Rather, the evidence that was adduced showed that the Debtor attempted to treat the Deposit in accordance with applicable law.

The CCRTLO section dealing with security deposits provides, in part, that the security deposit received and held by a landlord "shall not be commingled with the assets of the landlord[.]" CCRTLO § 42-811(D).  The risk of commingling includes "a landlord's intentional or inadvertent personal use of tenant funds contained in a commingled account." *Starr v. Gay*, 354 Ill. App. 3d 610, 613–14 (2004).  Commingling will occur when a landlord places a tenant's security deposit into an account with her own funds.  *In re Outlaw*, Case No. 19 AP 00713, 2020 WL 6940484 (Bankr. N.D. Ill. Sept. 15, 2020) (Schmetterer, J.).

The Debtor transferred the Deposit from her Chase Account to her Fidelity Account.  Tr., July 15, pp. 369–70.  Despite her later attempts to argue that she never received a deposit, per her own testimony, she did so believing that she was segregating the Deposit.  *Id.* at pp. 369–70.  The Fidelity Account, however, was used by the Debtor for other purposes.  Tr., July 14, pp. 272–73; Tr., July 15, pp. 371–72.  The Deposit was therefore not handled in accordance with the CCRTLO.  Still, while the Debtor may have mismanaged the Deposit and failed to properly manage her multiple businesses, those taken alone do not rise to the level of larceny.  To hold otherwise would

make a debtor strictly liable for larceny simply by failing to abide by the terms of the CCRTLO. The court will not do so and, as a result, the Plaintiff has failed to establish that larceny has occurred.

As such, the Plaintiff has failed to carry his burden with respect to Count II and judgment will be entered in favor of the Debtor on this count.

b. Count III: Fraud or Defalcation While Acting in a Fiduciary Capacity

Whether a debt is excepted from discharge will turn on whether the debtor committed fraud or defalcation while acting in a fiduciary capacity. The objecting creditor must establish "(1) that the debtor acted as a fiduciary to the creditor at the time the debt was created, and (2) that the debt was caused by fraud or defalcation." *Follett Higher Educ. Grp., Inc. v. Berman* (*In re Berman*), 629 F.3d 761, 766–67 (7th Cir. 2011); *see also DeFranco*, 658 B.R. at 485 (same).

As the court has made clear above, the Plaintiff simply has not made out a case for fraud. That still leaves defalcation and thus defalcation must still be considered in full. Unlike with larceny, the failure to comply with the CCRTLO initially at least appears to result in a strict case for liability under defalcation. That conclusion requires further scrutiny.

Under Illinois law, a landlord is obliged to act as a tenant's fiduciary as a trust-like relation is created between the parties, regardless of the labels used. *In re McGee*, 353 F.3d 537, 540–41 (7th Cir. 2003). In *Mcgee*, where the landlord "made off with the money," the Seventh Circuit deemed the landlord to be obliged to act as the tenants' fiduciary based on the court's reading of the Chicago Ordinance section 5-12-080(a) dealing with security deposits. *Id.* As the court stated, "[s]egregation of funds, management by financial intermediaries, and recognition that an entity in control of the assets has at most 'bare' legal title to them, are hallmarks of the trust." *Id.* Given that the debtor in *McGee* absconded, the Seventh Circuit easily concluded that a defalcation had occurred. *Id.*

This court in *Frempong*, applying *McGee*, found that a landlord who merely spends a security deposit "has committed an act of 'defalcation' and the debt (i.e. the security deposit and any damages) is not dischargeable in bankruptcy (see 11 U.S.C. § 523((a)(4))." *Frempong*, 460 B.R. at 195 (interpreting the Chicago Ordinance); *see also Outlaw*, 2020 WL 6940484, at *13 (same). As the *Frempong* court stated:

> The provisions of section 5–12–080 of the [Chicago Ordinance] governing security deposits do apply here and the only question is whether [the landlord] failed to comply with any one of the provisions. If so, it would constitute a violation of the Ordinance and would trigger the penalties and attorney fees associated therewith. That is, such violation(s) would also constitute defalcation under federal bankruptcy law and the entire debt associated with the violation would not be discharged.

*Frempong*, 460 B.R. at 195; *see also Outlaw*, 2020 WL 6940484, at *13 (same).

Thus, when a landlord-tenant dispute involving the proper handling of a security deposit under the Chicago Ordinance arose in the context of section 523(a)(4), the court in *Frempong* distilled the defalcation analysis to a simple question: Did the landlord comply with the Chicago Ordinance's required treatment of the security deposit?

24

This is not correct. *Frempong* and *Outlaw* appear to misread *McGee*. Further, neither *Frempong* nor *Outlaw* binds this court in this matter. What does bind this court is *McGee*, where the Seventh Circuit held clearly that the relevant Chicago Ordinance created a fiduciary relationship with respect to a landlord's treatment of a security deposit thereunder. *McGee*, 353 F.3d at 541. Further, absconding with that deposit constitutes a defalcation. *Id.* That does not create, however, as *Frempong* and *Outlaw* seem to say, strict liability for the handling of deposits under the Chicago Ordinance. There is still the issue of state of mind.

While defalcation does not require express intent, there is nonetheless a state of mind requirement, as this court has previously explained in *Fara*:

> Defalcation, on the other hand, is "a word that only lawyers and judges could love." *In re Jahrling*, 816 F.3d 921, 925 (7th Cir. 2016). It "'can be distinguished from fraud and embezzlement on the basis that subjective, deliberate wrongdoing is not required to establish defalcation,' though some degree of fault greater than negligence or mistake, but less than fraud, was required." *Id.* (*quoting In re Berman*, 629 F.3d 761, 766 n.3 (7th Cir. 2011)). As the Seventh Circuit pointed out in *Jahrling, id.*, the Supreme Court clarified the law in *Bullock*, holding that defalcation requires proof of "a culpable state of mind ... involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269, 133 S.Ct. 1754, 185 L.Ed.2d 922 (2013).

*Fara*, 663 B.R. at 722.

As noted in *Fara*, the Seventh Circuit in *Jahrling* was interpreting and applying the post-*McGee* Supreme Court case of *Bullock*. There can be little question that *McGee* stands for the proposition that the Chicago Ordinance defines the "relevant fiduciary behavior." Put another way, *McGee* established that the mistreatment of a deposit under the Chicago Ordinance constitutes a breach of the relevant fiduciary behavior for the purposes of *Bullock*.

As to the CCRTLO, it provides that after termination of the tenancy, "money held by the landlord as a security deposit shall be returned to the tenant within 30 days after the tenant has vacated their dwelling." CCRTLO § 42-811(C). It is true that the landlord, here the Debtor, is able to deduct from the deposit any reasonable amount necessary to repair any damages caused to the premises by the tenant. It must be noted that:

> In the case of such damage, the landlord shall deliver or mail to the last known address of the tenant, within 30 days, an itemized statement of the damages allegedly caused to the premises and the estimated or actual cost for repairing or replacing each item on that statement, attaching copies of the paid receipts for the repair or replacement. If estimated cost is given, the landlord shall furnish the tenant with copies of paid receipts, or a certification of actual costs of repairs of damage if the work was performed by the landlord's employees, within 30 days from the date the statement showing estimated costs was furnished to the tenant.

CCRTLO § 42-811(C)(2).

The CCRTLO also provides requirements for how the landlord must handle the security deposit received from the tenant.  It must further be noted that:

> A landlord shall hold all security deposits in a federally insured account in a bank, savings and loan association, or other financial institution located in the state of Illinois. A security deposit shall continue to be the property of the tenant making such deposit, shall not be commingled with the assets of the landlord, and shall not be subject to the claims of a creditor of the landlord or of the landlord's successors in interest, including a foreclosing mortgagee or trustee in bankruptcy.

CCRTLO § 42-811(D).

The requirements of the CCRTLO are not materially different from those of the Chicago Ordinance.  The Illinois state courts and the federal courts in question would no doubt treat them the same, and this court will do no different.  The court is therefore assured that a failure to abide by these provisions of the CCRTLO would be a breach of the relevant fiduciary behavior sufficient to satisfy *Bullock*.  So says *McGee*.

But that is all *McGee* establishes.  It does not establish whether a landlord who violates the relevant ordinance has a culpable state of mind involving knowledge of or gross recklessness in respect to that relevant fiduciary behavior.  *Bullock*, 569 U.S. at 269.  Both *Bullock* and *Jahrling* make clear that state of mind is a required element of defalcation.  *Id.*; *Jahrling*, 816 F.3d at 925.  As a result, the Plaintiff must establish that the Debtor possessed a culpable state of mind involving knowledge of, or gross recklessness in respect to, the improper nature of the Debtor's handling of the Deposit.

As to the Debtor's state of mind, while she testified that she was not specifically familiar with the CCRTLO at the time her landlord-tenant relationship with the Plaintiff arose, Tr., July 15, pp. 379–80, her uncontroverted testimony is that she has been a landlord in numerous previous matters and is "very familiar with security deposits and how they work." *Id.* at p. 435.  The Debtor went on to testify that "security deposits are pretty standardized in real estate," *id.*, and, when asked if she is aware of the consequences for mishandling a security deposit, answered "yes." *Id.* at p. 437.

While the Debtor may not have been aware of the CCRTLO exactly, such security deposit provisions are similar across jurisdictions.  The Ohio Revised Code, for example, states that "[a]ny deduction from the security deposit shall be itemized and identified by the landlord in a written notice delivered to the tenant together with the amount due, *within thirty days after termination of the rental agreement and delivery of possession*." Oh. Rev. Code § 5321.16(B) (emphasis added).  Ohio is, of course, one of the three states in which the Debtor let her properties and is where the Debtor was sued for failure to comply with that same provision.  *See* Ohio Lawsuit; Px. 20, at ¶ 25.

California is the other of the three states.  Under the California Civil Code, there are similar requirements.  The California Civil Code states, in pertinent part, that "[n]o later than 21 calendar days after the tenant has vacated the premises, but . . . not earlier than 60 calendar days prior to the expiration of a fixed-term lease, the landlord shall furnish the tenant, by personal delivery or by first-class mail, postage prepaid, a copy of an itemized statement indicating the basis for, and the amount of, any security received and the disposition of the security, and shall return any remaining portion of the security to the tenant." Cal. Civ. Code § 1950.5(h)(1).

So, the Debtor, whose uncontroverted testimony is that she entered into thousands of leasing transactions in Illinois, Ohio and California and that she was aware of the legal requirements for handling tenant deposits, cannot hide behind a claimed lack of knowledge of the specifics of the CCRTLO. At the very least, if the Debtor was unaware of the directly applicable statute, she was willfully ignorant of her requirements as a landlord. Such willful ignorance constitutes either a culpable state of mind involving knowledge of, or gross recklessness in respect to, the improper nature of her relevant fiduciary behavior. *Bullock*, 569 U.S. at 269.

The Debtor therefore clearly knew or should have known that she had to return the Deposit and, in fact, told the Plaintiff that she would after accounting for damages. To be clear, those were the Debtor's only two choices: return the Deposit in full or retain that portion of the Deposit for which she accounted for in the prescribed time and return any remainder of the Deposit.

In spite of this, the Debtor did neither. The Plaintiff vacated the Property on September 13, 2022. Despite repeated requests from the Plaintiff, at no point prior to this lawsuit did the Debtor provide the Plaintiff with an itemized statement of the damages or copies of the paid receipts for any such repairs as required by the ordinance. CCRTLO § 42-811(C)(2). Section 42-811(C)(2) states specifically that "[i]n the case of such damage, the landlord shall deliver or mail to the last known address of the tenant, within 30 days, an itemized statement of the damages allegedly caused to the premises and the estimated or actual cost for repairing or replacing each item on that statement, attaching copies of the paid receipt for the repair or replacement." Only in the context of defending this action did the Debtor account for her retention of the Deposit, which is far too little and far too late. At the very least, the Debtor acted with gross recklessness with respect to the handling of the Deposit.

As such, the Debtor has failed to perform the relevant fiduciary behavior and has done so with the requisite state of mind. The Plaintiff has therefore carried his burden with respect to this aspect of Count III and judgment will be entered in favor of the Debtor in this regard on this count.

As a result, the total debt owed to the Plaintiff by the Debtor of $19,644, plus reasonable attorney's fees to be determined at a later hearing, is excepted from discharge under Count III of the Complaint, which relies on section 523(a)(4) of the Bankruptcy Code.

CONCLUSION

For the reasons stated above, judgment will be entered in favor of the Plaintiff on the Complaint. That judgment will not conclude the Adversary, which will not conclude until the court makes a determination on attorney's fees.

Dated:   November 6, 2025                    ENTERED:

_____
Judge Timothy A. Barnes
United States Bankruptcy Court

27